IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

Henrico County School Board,

        Plaintiff,

v.                                                                   Civil Action No.  3:18cv00110

Gregory Matthews and Tonie Matthews,
as parents and next friends of G.M.,

        Defendants.

## COMPLAINT

The Henrico County School Board ("School Board" or "HCPS") brings this action pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq., and its federal and state implementing regulations, 34 C.F.R. Part 300; 8 VAC 20-81-10 et seq. (collectively "IDEA"). The School Board seeks reversal of the Hearing Officer's December 14, 2017 decision, to the extent the decision was adverse to the School Board, and seeks a ruling in favor of the School Board. The aspects of the Hearing Officer's decision that were adverse to the School Board were not supported by the law or the facts.

### I.   INTRODUCTION

1. This action is brought to appeal the aspects of the December 14, 2017 decision ("Decision")[1] of the administrative Hearing Officer in the special education case of G.M. (or "Student"). See Exhibit A (redacted version of Decision).

2. The Hearing Officer identified fifteen issues for decision in the hearing, but failed to determine the identified issues and held that a private placement was necessary for the Student. The Hearing Officer's Decision was based on an issue that was barred by the statute of limitations

---

[1] The Decision has been redacted pursuant to Rule 5.2 of the Federal Rules of Civil Procedure.

as it concerned a 2008 Functional Behavioral Assessment ("FBA") and Behavior Intervention Plan ("BIP") and evaluations which were not requested by the Parents.

3. Significantly, the Hearing Officer ruled in favor of the School Board by refusing to set aside the IEP developed on June 14, 2017, which was the last IEP proposed before the due process hearing.

4. Contrary to the law and evidence, the Hearing Officer held that G.M. should be placed in a private day school.

5. Under the IDEA, a private school placement is not appropriate unless the Parents prove that the school division's program is inappropriate and that the Parents' proposed program is appropriate.

6. The Parents failed to meet their burden of proof through expert testimony or otherwise.

7. The Hearing Officer's Decision was based on claims and allegations outside the applicable two-year statute of limitations. See 20 U.S.C. § 1415(f)(3)(C). The Hearing Officer relied on a 2008 FBA and BIP when the Student was a six (6) year old first grader. At the time of the due process proceeding, however, the Student was a fifteen (15) year old high school student in the tenth grade who was no longer exhibiting the behaviors addressed in his first grade BIP.

8. Further, under the IDEA, a BIP is not a legally required component of a Student's Individualized Education Program ("IEP").

9. The Parents also had not requested that an FBA be conducted by HCPS prior to initiating the hearing and had agreed to the last re-evaluation in December 11, 2014.

10. The Decision failed to give deference to the opinions of School Board experts, as required by law, who testified that: (a) the School Board's proposed IEPs were appropriate; (b)

G.M. was making educational progress in light of his circumstances; (c) the public school setting was the least restrictive environment for G.M.; (d) he did not exhibit significant behavioral concerns in the public school, and (e) that a private school placement was not required for G.M.

11. The Hearing Officer ignored the lack of cooperation by the Parents who: (a) unreasonably prevented the Student from attending school since December 2016; (b) unjustifiably refused to allow the Student to receive any educational services for over a year; and (c) refused to allow the School Board to conduct any evaluations of the Student.

12. The Hearing Officer also failed to ensure that the atmosphere at the hearing was conducive to fairness at all times, by allowing the Parents' advocates to attack School Board witnesses and School Board legal counsel by calling them disparaging and inappropriate names throughout the proceeding and by publicly publishing inappropriate remarks about them relating to their personal and professional lives during the hearing.

13. The Hearing Officer's Decision is erroneous and should be reversed except for the aspects of the Decision finding in favor of the School Board such as the determination to uphold the appropriateness of the June 14, 2017 IEP.

14. The School Board asserts that the Decision is now moot as a subsequent decision rendered in a case between the same parties found that the Parents had failed to prove the inappropriateness of the latest IEP proposed for the Student dated November 6, 2017, which IEP called for a public school placement. (See Exhibit B, redacted Decision dated January 23, 2018). Thus, the most recent and Hearing Officer approved IEPs for the Student place him in a public school which constitutes the current placement for the Student under the IDEA.

## II.    PARTIES

15.    The Henrico County School Board ("School Board") is a political subdivision of the Commonwealth of Virginia existing pursuant to the Constitution and statutes of Virginia.  The School Board is vested with the authority to supervise the public schools within Henrico County.  Va. Const., Art. VIII, § 7; Va. Code § 22.1-71; see generally Title 22.1 of the Code of Virginia.

16.    The School Board office is located at 3820 Nine Mile Road, Richmond, Virginia 23223 in the County of Henrico.

17.    G.M. is a minor child who resides in Henrico County, Virginia and was a Henrico County Public Schools' student until December 15, 2016.  Gregory Matthews, G.M.'s biological father, and Tonie Matthews, G.M.'s stepmother (collectively "Parents") at all relevant times, have resided with G.M. in Henrico County, Virginia.

18.    G.M. was born on August 16, 2002 and is identified as a student with Autism under the IDEA.  He is a delightful young man, although non-verbal and of extremely low cognitive functioning.

## III.    JURISDICTION AND VENUE

19.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA.  See also 20 U.S.C. § 1415(i).

20.    Venue is proper pursuant to 28 U.S.C. § 1391(b).  The U.S. District Court for the Eastern District of Virginia, Richmond Division, is the proper Division pursuant to Rule 3 of the Local Rules for the Eastern District of Virginia.

## IV.    STATEMENT OF THE FACTS

21.    G.M. is a non-verbal, 15-year-old Student with autism who functions in the lowest range intellectually.  Recent IQ testing reveals his IQ to be 40 which places him in the

4

<0.1 percentile, meaning 98.9% of the population functions at a higher level intellectually. His expected rate of educational progress would be extremely slow in light of this cognitive ability.

22. G.M. was found eligible for special education and related services under the disability classification of Autism.

23. G.M. was assigned to Highland Springs High School during the 2016-2017 school year.

24. G.M. received academic, behavioral, and social skills services in the Academic Integrated Services Program which is a self-contained setting within the public school and includes both students with Autism, as well as students with cognitive deficits. The Integrated Services classroom is designed to provide a structured and predictive environment to address G.M.'s academic, functional, communication, social, and self-care needs.

25. G.M.'s class was a highly structured environment which consisted of approximately 12 students and at least four staff members. The class was taught by one teacher endorsed in special education by the Virginia Department of Education and three instructional assistants. Further, related service providers, *i.e.* speech pathologists, physical therapists, and/or occupational therapists, would provide services to students within the classroom throughout the week which increased the amount of staff support and services. Two nurses were also in the class to provide services to students with medical needs.

26. G.M. received specially designed academic instruction and support with behaviors and social skills in the Integrated Services program during the 2015-2016 and 2016-2017 school years and made progress appropriate with his abilities as demonstrated by a chart of progress prepared by School Board staff and admitted into evidence and the testimony of School Board experts.

27. Further, G.M. received speech and language services as a related service from speech and language certified professionals. These services addressed his significant communication deficits and were appropriate for his needs.

28. G.M. also interacted well with his typically-developing peers during school activities, which afforded him the opportunity to model age-appropriate social and communication skills.

29. On April 22, 2016, the IEP team convened and proposed that G.M. be placed in the Integrated Services program within the public school setting. The Parents provided written consent for the School Board to consent to implement the IEP. G.M. made progress in the Integrated Services Program.

30. On December 8, 2016, the IEP team convened to develop an annual IEP for G.M. and proposed that he continue to be served within the Academic Integrated Services Program at Highland Springs High School.

31. The Parents did not provide consent to the implementation of the December 8, 2016 IEP, but did not provide any objections to the IEP or a rationale for their refusal to provide consent. They also did not request changes to the proposed IEP.

32. The proposed IEP could not be implemented without written parental consent.

33. Beginning December 15, 2016, G.M.'s Parents refused to allow him to attend school at Highland Springs High School or any other Henrico County public school. The Parents alleged that G.M. had been physically and emotionally abused by an Instructional Assistant, although there was no evidence that any abuse occurred.

34. The school principal immediately notified the Department of Social Services ("DSS") of the Parents' allegation. After conducting its investigation, DSS determined that the allegations were unfounded.

35. The Parents refused to allow G.M. to attend school even after being informed that, pending the completion of the DSS investigation, the Instructional Assistant would have no contact with the Student and even after the Parents were advised by DSS that there was no evidence of abuse.

36. On March 6, 2017, the IEP team convened to discuss G.M.'s attendance and a plan to transition G.M. back into the school environment.

37. During the IEP meeting, the Parents did not express *any* concerns with the IEP or with the educational program proposed on December 8, 2016. The Parents' only concern expressed during the IEP meeting pertained to the Instructional Assistant and their insistence that the Instructional Assistant be terminated or removed from Highland Springs High School.

38. To address the Parents' concerns regarding the Instructional Assistant, School Board staff reiterated to the Parents that the Instructional Assistant was to have no contact with G.M. The IEP team also proposed transitioning G.M. to another high school within Henrico County. During the IEP meeting, however, the Parents were adamantly opposed to transferring G.M. to another school and insisted that G.M. remain at Highland Springs High School.

39. At no point during the March 2017 IEP meeting did the Parents request a private school placement for G.M. nor did they express any concerns with the Student's IEP.

40. Following the March 6, 2017 IEP meeting and the March 15, 2017 DSS determination that the allegations of abuse were unfounded, the Parents inexplicably continued their refusal to allow G.M. to return to school.

41. In April 2017, the Parents retained the services of two lay advocates and first requested a private school placement for G.M. for the 2016-17 school year  This request was the first indication of concerns with the educational program during the period of time that G.M. had been attending Highland Springs High School.

42. On May 10, 2017, the School Board requested that the Parents provide consent to evaluate G.M.  The Parents, without justification, refused to permit the School Board to conduct *any* evaluations of G.M. and such refusal has continued through the present time.

43. An IEP meeting was held on June 14, 2017 to consider whether G.M. was eligible for extended school year services and to consider the Parents' request for a private school placement.

44. The IEP team considered and discussed the criteria for extended school year services and determined that G.M. met the criteria to receive services over the summer.  The IEP team proposed an IEP placing the Student in the Integrated Services Program in the public schools.

45. The School Board also considered the Parents' request for a private school placement and rejected the Parents' request on the basis that G.M. could receive a free appropriate public education in the public school.

46. During the IEP meeting, the School Board proposed that a self-contained Integrated Services classroom located in the public school setting could provide G.M. with the academic support, communication skills, structure and interventions needed to address his needs. The Student had made progress in that setting.

47. The June 14, 2017 IEP was affirmed by the Hearing Officer in light of the Parents' unjustified refusal to cooperate and to allow evaluations.  The Parents were not allowed

8

to attack the absence of evaluations when they had not consented to evaluations that had been proposed by HCPS.

48. The IEP team convened again on November 6, 2017 to develop an annual IEP for G.M. for the 2017-2018 school year and to consider a letter from G.M.'s treating physician supplied by the Parents' advocates. The treating physician was unfamiliar with G.M.'s performance at school, had not discussed G.M. or his education with school staff, and had not observed the Student in the school setting.

49. The School Board again proposed that the self-contained Integrated Services classroom located in the public school setting offered G.M. a free appropriate public education.

## DUE PROCESS PROCEEDINGS

50. The Parents, through their advocates, initiated five (5) due process proceedings against the School Board between April 2017 and December 2017. The first Request for Due Process Hearing was initiated on April 30, 2017 and was dismissed, without prejudice, by the Hearing Officer, William Francis, Jr., on June 19, 2017.

51. The Parents filed a second Request for Due Process Hearing on June 16, 2017, two days before Hearing Officer Francis dismissed their first Request for Due Process Hearing. John Robinson was appointed as the Hearing Officer by the Executive Secretary's Office of the Supreme Court of Virginia for the second Request for Due Process Hearing. This second hearing request was subsequently withdrawn by the Parents on June 22, 2017.

52. The Parents initiated the third Request for Due Process Hearing, which is the subject of this appeal, on July 27, 2017. Hearing Officer Robinson was again appointed to preside over the hearing. The hearing proceeded on September 11, 2017 and was conducted over eight days.

53. The Parents filed a fourth Request for Due Process Hearing on October 25, 2017. The Request for Due Process Hearing was dismissed by Hearing Officer Lorin Costanzo on November 28, 2017.

54. The Parents filed a fifth Request for Due Process Hearing on November 9, 2017 challenging the IEP proposed on November 6, 2017 for the 2017-2018 school year. Lorin Costanzo, Esquire was appointed as the Hearing Officer. The hearing proceeded on December 11, 2017. Mr. Costanzo rendered a decision on January 23, 2018 in favor of the School Board.

55. In all five (5) of the complaints, the Parents alleged that the Student had been denied a free appropriate public education and requested that the Student's placement be changed from the public school to a private day school (the Faison Center) at the expense of the School Board.

56. Mr. Robinson's December 14, 2017 Decision was rendered based on IEP(s) developed prior to September 11, 2017, the date on which the third due process hearing began.

57. Mr. Robinson refused to find that the most recently developed IEP that he reviewed in the third hearing request, the June 14, 2017 IEP, was inappropriate.

49. Mr. Costanzo's January 23, 2018 decision found no error with the November 6, 2017 IEP, which was the most recent IEP and proposed placement of G.M. in the self-contained setting within the public school for the 2017-2018 school year.

50. Based on the subsequent decision by Mr. Costanzo, and the ruling by Mr. Robinson regarding the June 14, 2017 IEP, the Student's current educational placement is the public school setting.

## JULY 27, 2018 DUE PROCESS HEARING

51. The Parents initiated the due process proceeding that is the subject of this appeal on July 27, 2017.

52. The Parents were required to bear the burden of proof in the due process proceeding. See Schaffer v. Weast, 546 U.S. 49, 62 (2005).

53. A hearing officer is required to give deference to the opinions of school board witnesses who are professional educators. Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, No. 15-827, 137 S. Ct. 988 (2017).

54. Multiple School Board experts testified that G.M. was benefiting from his educational program in light of his circumstances and making appropriate progress. Id. The School Board's experts had direct knowledge of G.M. and were familiar with G.M. through testing, observation and through teaching him. They testified that the proposed IEPs were appropriate for G.M.

55. The School Board experts also had substantial training and experience in working with children with autism and with G.M.

56. School Board experts testified that G.M.'s educational needs were being met in the Integrated Services Program within the public school. Although G.M. had significant cognitive deficits, he was making steady progress towards his IEP goals. He was also making progress with his transitional and vocational skills. Further, he had various opportunities to interact with his typically developing peers.

57. The School Board's expert witnesses also testified that G.M. did not exhibit significant behaviors in the school setting. The School Board's experts testified that his behaviors were appropriately managed within the Integrated Services Program and that G.M.

exhibited improvements in his behavioral functioning during the middle school through high school period of time.

58. Although the Parents reported behavioral concerns in the home, significant behaviors were not observed in the school setting.

59. The School Board's experts, who had direct knowledge of G.M. in the public school setting, testified that there was no need for an FBA or a BIP. They also testified that his Parents had not requested these assessments and had refused more recently proposed assessments.

60. At the most recent formal review of G.M.'s eligibility on December 11, 2014, the Parents did not ask for any evaluations, including an FBA or a BIP.

61. At the time of the third due process hearing request, the Parents had not asked for an FBA or a BIP.

62. Although not requested by the Parents or required due to the minimal and manageable behaviors exhibited by the Student, the School Board proposed to conduct an FBA on May 10, 2017. The Parents, however, refused to provide consent to the assessment and had no justification for their refusal.

63. The School Board's expert witnesses were entitled to deference in their judgment that the proposed IEPs and placement were appropriate. The Hearing Officer failed to give the School Board's witnesses the deference they were due.

64. In stark contrast to the School Board's experts, the Parents' experts did not demonstrate any expertise regarding autism, special education, or G.M.'s educational needs. These experts also had minimal or no direct knowledge of G.M.

65. The Parents called Zoe Spencer, a sociologist. Spencer testified that she is not licensed by the Virginia Department of Education, in any area, that she is not an expert in special education matters, and that she is not qualified in the area of providing education services to students with disabilities.

66. Spencer also testified that she never observed G.M., was not familiar with the School Board's programs, had not discussed G.M.'s educational programs and performance with School Board staff, had not participated in IEP meetings for G.M., and was not an expert in autism or in special education. Spencer also testified that she was not familiar with the Faison Center, the private school placement requested by the Parents.

67. Spencer did not offer any testimony specific to G.M. or to the School Board's programs, but instead testified broadly regarding cultural competence and institutional racism, issues which were not germane to the placement decision and not addressed by the Hearing Officer.

68. Similarly, the Parents' witness, Dr. Marla Crawford, whom the Parents called to testify regarding the Student's IEP and its implementation, stated that she has never been a special education teacher. Crawford also testified that she has never been responsible for IEP case management for any student. The Hearing Officer allowed her to testify as an expert witness despite the objections by the School Board.

69. Further, Crawford had no direct knowledge of G.M. She never administered any assessments of G.M. and did not observe him in the educational setting. Crawford had not observed G.M. in person prior to meeting him at the hearing and had only viewed him in a brief five minute video provided by the Parents prior to her testimony. She had no basis for giving opinions regarding G.M.'s educational needs.

70. The Parents also called Adam Warman, a representative from the Faison Center, to testify as an expert witness. Warman had knowledge of Faison, but had never evaluated G.M., or communicated with any of G.M.'s teachers. He had only briefly seen G.M. Warman offered no opinions to discount the appropriateness of the School Board's proposed program or its IEPs and did not offer an opinion about whether G.M. could be served in the public school setting or whether the proposed IEPs were appropriate. He testified that G.M. had been accepted to the Faison Center and they could serve him there.

71. None of the Parents' expert witnesses provided any testimony that would refute the effectiveness of the School Board's educational program, the progress G.M. had made considering his limited cognitive ability and his other circumstances, or the School Board's provision of free appropriate public education to the Student.

72. The Parents thus failed to prove that the School Board's IEPs were inappropriate and that the Faison Center was the least restrictive environment in which G.M. could learn.

73. Not only did the Hearing Officer err in his consideration of the law and facts of the case, but the hearing was not conducted in a manner that was fair to the School Board, its employees, or its legal counsel.

74. Throughout the proceedings, the advocates made threatening statements directed to and/or about School Board witnesses, including statements implying that they would take actions to have their professional licenses revoked and made defamatory statements directed to and/or about School Board employees, including statements implying that they have committed or are willing to commit criminal acts. The advocates also posted pictures of School Board employees on social media without the employees' permission with captions such as "cause [sic] working in the house is better than working in the field." The advocates also posted on social

media assertions that school staff members were willing to "lie, steal, and kill" to maintain their salaries and referred to their positions within the School Board as "house negress positions."

75. The advocates also published defamatory statements directed to and/or about the School Board attorneys, including statements alleging that they, among other things, "promote 'modern day slavery.'"

76. Further, the advocates made numerous attempts to have the School Board attorneys fired while representing the School Board in the case by writing to the Henrico County Board of Supervisors and Leadership and making derogatory and/or defaming allegations against School Board legal attorneys; and they copied complaints about the School Board attorneys to the Virginia State Bar personnel who investigate complaints against attorneys; and published defaming statements directed to and/or about the School Board attorneys, inviting members of the public to file "formal complaints" against the Reed Smith law firm.

77. The Hearing Officer failed to address these improper acts and incorrectly gave the advocates the status of attorneys during the hearing. The Hearing Officer held them to no standards of practice or any ethical requirements. The Hearing Officer did not address the inappropriate comments made by the advocates in connection with the hearing.

78. The advocates' actions prevented the conducting of a fair and impartial proceeding and had a chilling effect on the due process hearing.

### ERRONEOUS FINDINGS BY HEARING OFFICER

79. The evidence and the laws governing the provision of special education services do not support the Hearing Officer's Decision.

80. The Hearing Officer committed error by failing to render a proper Decision based on an accurate and impartial application of law to the facts.

81. The Hearing Officer committed error by failing to apply correct legal standards in rendering his Decision.

82. The Hearing Officer erroneously based his findings on a 2008 FBA and BIP that were barred by the applicable two year statute of limitations.

83. The Hearing Officer ignored the fact that the Parents had not requested an FBA or BIP prior to initiating the hearing; agreed upon the scope of the re-evaluation conducted in December 2014; and refused the evaluations when proposed by HCPS in May 2017.  Further, the School Board's expert, the Student's teacher, gave testimony that G.M. exhibited appropriate behaviors in the school setting and could be managed in that setting.

84. Further, the Hearing Officer:

(a) erred by disregarding the Parents' lack of cooperation with the School Board, including the Parents' unjustified refusal to allow the Student to attend school to his educational detriment;

(b) erred by failing to give deference to School Board employees' testimony regarding the appropriateness of the school division's educational program for the Student and the inappropriateness of the private school setting for the Student;

(c) erred by not reviewing the appropriateness of each individual IEP;

(d) erred by failing to consider the Student's progress in light of the Student's individual circumstances;

(e) erred by finding that the FBA needed to be incorporated into the Student's IEP as an FBA is not a required component of an IEP and by disregarding the behavioral goals and accommodations which were included within the IEP and embedded within the Student's educational program;

16

   (f) erred in determining that the School Board failed to allow the Parents to fully participate in the IEP process as the evidence indicated that the Parents signed the April 2016 IEP and did not raise any concerns with the December 2016 IEP at the meeting;

   (g) erred in suggesting that the goals in the various IEPs were the same when the expert testimony did not support this conclusion;

   (h) erred in finding that a private school placement was needed when the expert testimony established that the Student could be educated in the public school pursuant to the proposed IEPs and had made appropriate progress in light of his circumstances;

   (i) erred in finding that the Student had not made progress when that conclusion was not supported by expert testimony;

   (j) erred in concluding that the lack of an FBA and BIP resulted in a denial of participation by the Parents in the IEP process;

   (k) erred in the legal standard used to find that the Student would benefit from a private school placement without a finding that the Student could not benefit from an education in the public schools;

   (l) erred in suggesting that a private placement was warranted as compensatory education when there was no evidence of the basis for compensatory education or the amount of compensatory education to be awarded;

   (m) erred by finding no harm to the School Board as a result of the Parents' failure to provide proper notice to the School Board of their intent to place the Student in a private school;

   (n) erred in the application of the legal standard for tuition reimbursement; and

      (o)    erred by unfairly giving the advocates the status of attorneys but also finding that there were no ethical parameters in which they were required to operate.

85. The administrative record will be filed with this Court.

WHEREFORE, the School Board respectfully requests that the Court:

1. Hear additional evidence;

2. Reverse and vacate the Hearing Officer's December 14, 2017 Decision to the extent that it was adverse to the School Board; and

3. Find that the School Board's proposed IEPs provided G.M. with a free appropriate public education in the least restrictive environment; that G.M. made progress that was appropriate in light of his circumstances and that the Student can be appropriately educated in the public school setting.

4. Award the School Board its costs and attorneys' fees and such other relief as the Court deems warranted.

          Respectfully submitted,

          HENRICO COUNTY SCHOOL BOARD

          By: /s/ Kathleen S. Mehfoud
          Kathleen S. Mehfoud (VSB No. 18096)
          LaRana J. Owens (VSB No. 47254)
          REED SMITH LLP
          Riverfront Plaza, West Tower
          901 East Byrd Street, Suite 1700
          Richmond, VA 23219
          T: (804) 344-3400
          F: (804) 344-3410
          kmehfoud@reedsmith.com
          lowens@reedsmith.com

          Counsel for the Henrico County School Board